We'll now move to the final argument on the calendar, that's Shapiro v. United States. Mr. Locher, am I pronouncing that right? It's Locher, Your Honor. I'm sorry about that. No problem. And Ms. Palau? Good morning, Judge Sullivan. Ah, there you are. So, Mr. Locher, you've reserved two minutes for rebuttal, so that gives you eight minutes up front. The floor is yours. Thank you, Your Honor, and may it please the Court, Steve Locher on behalf of the petitioner and appellant Mark Shapiro. Mr. Shapiro was convicted in November of 2009 of various fraud offenses arising out of his involvement in a real estate development venture known as Cobalt, or Cobalt Capital Companies. He was later sentenced to 85 years imprisonment, effectively a life sentence, which was a within-guidelines sentence under the sentencing guidelines calculation as made by the District Court at the time. As is the case in many large-scale fraud cases, the most significant factor in determining his sentence was the loss amount, which the District Court found to be approximately $23 million, representing the entire amount, essentially, that had been invested by the investors in this project. That loss amount calculation added 22 levels to his offense level and resulted in the 85-year sentence of imprisonment under the guidelines. Had the District Court found the loss amount to be just a little bit lower, to be 20% lower, for example, the bottom end of Mr. Shapiro's guidelines range would have shifted by 55 years, from 85 to 30. There would have been, in a situation like that, an obvious and huge potential benefit to Mr. Shapiro from all the efforts his trial counsel could have made to try and chip away at that loss amount calculation at the time of sentencing. But his trial counsel did not make any such attempt to present the District Court with fact or expert evidence showing the substantial value of the real estate that Cobalt continued to own at the time the fraud was discovered. Can I interrupt? I'm sorry. Mr. Stitsky kind of pursued this a little more aggressively in the initial case of his sentence, right? Not exactly. He did raise the issues, and he argued that the District Court needed to adjust the loss amount to account for losses caused by other factors, such as market forces and things like that. And that's Cobalt's properties, right? That's right. But he did not present any fact or expert evidence as to the value of those properties. Instead, after making that argument, he pivoted and argued that the District Court should go in a completely different direction and just look at the excessive management fees as an estimate of the loss. So Mr. Stitsky's counsel, like Mr. Shapiro's counsel, did not try to make any sort of evidentiary record that would have tied that sentencing hearing into this Court's holdings in cases like Rutkoski and Leonard, where this Court has recognized that the residual value of a security or of an ownership interest at the time of discovery of the fraud has to be taken into account. Let me interrupt again. Here's what we said the first go-around in Stitsky, which was your client's appeal as well. Even if some of Cobalt's properties retained value at the time the fraud was uncovered, the District Court reasonably concluded that the Cobalt securities had no value because there was no realistic possibility that Cobalt would be able to generate a positive return for investors. Doesn't that pretty much foreclose this entire argument? That conclusion that this Court reached was based on the record as it existed at that time. And at that time, no one had presented any expert evidence to show that Cobalt actually retained substantial $100 million in real estate. Mr. Wilk, let me just put aside the mandate word for a minute. Even based upon this new evidence, what you have to argue is that this is more than just a paper net equity. The fact that an accountant says if you subtract the liabilities versus the value of the appraised properties, it's between $15 and $20 million. The government argued previously, and they continue to argue now, that the units were unmarketable, non-transferable, and by their terms, unredeemable for a period of 24 months. I won't even broaden that argument because I understand Leonard says just because something is illegal doesn't mean it doesn't have value. But that was an ongoing concern. It was a movie company that was continuing to operate. Explain to me how that paper net equity could have been realized by the victims within the 24 months or even after the 24 months. As far as I could tell, in fact, I looked at the sentencing four years later, that those units, whatever they were worth, nobody ever got any money out of those units. Explain to me how they weren't just illiquid, but they were just unredeemable, unmarketable, and non-transferable in any way for years, maybe even to today. I first direct your attention to Lepkoski, which says that the value of those residual securities should have been determined at the time of discovery of the fraud. I understand your point that because of the illiquidity and then, of course, with the market crash and the real estate crash in 2007-2008, by the time the receiver finally got to the point of liquidating those assets, there wasn't much left. But if we focus on the time of discovery of the fraud, if there was still value then, then that really gets to the heart of the holdings of Lepkoski and Leonard. They were unredeemable for 24 months, so at the time of the fraud, they couldn't do anything with those units, nothing, right? Well, it depends. A lot of those investments had been made in 2003-2004, probably late 2004, so you were actually probably coming up pretty close on the 24-month period already. But even setting that aside, I would, in fact, go back to Leonard, which I think makes clear that even illiquid LLC units, the value of those units, even if they can't be readily transferred into cash, that still needs to be taken into account. But for the great recession that we had in 2007-2008, the assets that were being held here were real estate assets, which generally and inherently have value, even if the construction isn't finished, even if there's some debt on the property. I mean, if you're right about that, then it would seem to me that the District Court and the Second Circuit were wrong in saying that the denial of an appraisal was not an abuse of discretion. I mean, this is what we said in the Second Circuit in Stitsky, that an appraisal would not approve that the units had value, even if it could have demonstrated that the properties had value. So you seem to be saying that you get to do an appraisal when we've already said that an appraisal wouldn't have made a difference. So two responses to that. First, the problem that this Court identified was that nobody had tried to translate the value of the properties into a value of the units. This Court of the District Court, based on the record as it then existed, was of the belief, probably rightly so, that the one wouldn't have influenced the other. But that problem has been corrected in this 2255 petition as well. There is an explanation, three different experts, but primarily a CPA, explaining that if you've got properties that have significant value, that does in fact translate into value for the LLC units. It's also important to recognize the context in which the request for appraisal was made at the time of the original trial. The request for appraisal was not made in connection with sentencing or in connection with the loss amount argument. The request for appraisal was made prior to trial because Mr. Shapiro's attorney was trying to argue that the business was not a complete sham, that there were real properties here with real value. So he was attacking the issue of liability when he made that request. May I ask you, my concern here is that the victims of this scheme did not pay over their money intending that it be invested in this real estate property. And yet the thrust of your argument is that they, the victims, or at least the government, were required to mitigate their losses by effectively assuming the risk of a market that they never intended to go invest their money in at all. And I am wondering whether our cases about other investments even translate into this context. Why should it? Well, Your Honor, the investors knew that they were investing in real estate. Now, I accept that they did not realize the history of the Cobalt companies and that there were misrepresentations or omissions in the PPM, so they may not have wanted to invest in this particular project. But I would submit that they did in fact know that they were investing in real estate. My concern is where they wouldn't have put their money into an investment to begin with. How does the risk of a market decline fall on them rather than on the defendants? I mean, there's no evidence here that the defendant was regularly turning over these businesses and providing the profits to the investors. So why is it they who bear the loss of the changing market rather than your client? The answer, again, I would submit, Your Honor, comes back to Leonard. And Leonard, the district court concluded that the investors' loss was the entire amount of their investment in that particular venture. And yet this court held that that was not the appropriate measure of loss. In other words, even accepting that these investors would not have put the money in at all had they known the truth, it is still necessary for the district court to make a determination at the time of sentencing with respect to any residual value that existed. I see where, if you had a good faith argument that the government or the receiver had acted negligently in disposing of the profit, that your client shouldn't be held chargeable for that. But that's not this case. And you're suggesting that a fraud is less serious than it is when the fact of the matter is that none of these people would have given over any of the money. All I'm trying to suggest, Your Honor, fraud is always serious. All I'm trying to suggest is that... Because what I'm trying to assess here with the guideline is the severity of the fraud. That's the purpose of the guideline, using the loss amount. How serious is this fraud? But even there, under this court's precedent, there has to be some consideration given to the residual value of the property that was obtained. If it's realistic to expect that the victims can realize it. That gets, I think, to the merits of this issue. But the district court never got there because the district court used the mandate rule to decide, just categorically, that it wasn't necessary to get to the merits. There may be a merits question there, Your Honor. But I would submit that that is all the more reason for this court to reverse, at least as to the district court's application of the mandate rule, and let the district court decide whether this evidence really did show value. We think it does. But if the district court concludes otherwise, well, that's an issue that we believe should be litigated on the merits. Let me ask you for a little more time to press you on the first prong of the Strickland claim that you've got. If I understood it correctly, counsel did adopt the co-defendant's loss challenge, which was ultimately rejected by the district court and affirmed on appeal. And it seems to me reasonably focused on other grounds to urge leniency. So in those circumstances, mindful of precedent that recognizes these are strategic choices that counsel can make, how can you even satisfy the first prong of Strickland here? So, arguing that the loss amount was too high is not mutually exclusive from also presenting mitigating evidence. And in fact, in a case like this where the guideline was so high and the loss amount was so high... No, I understand that. But we've recognized that counsel, it's one of the strategic things that counsel can do to focus on certain arguments and abandon others. As I said, counsel did adopt his co-defendant's loss figures and the argument. So it's not as if he abandoned it. Right, but neither Mr. Shapiro's counsel nor Mr. Stitz's counsel presented any actual expert evidence or testimony or information about those issues. So it's true that they said the words, but they didn't offer the evidence that needed to be offered in order to actually support it. It's a little bit like a defense attorney saying, well, my client is innocent, but not investigating or producing evidence that would have shown that. And this court's precedent shows that in those circumstances, post-conviction review sometimes is available. So I respectfully submit that deciding to focus on... Does the district court and the court of appeals basically reject the argument no matter what a value would have shown? So to that extent, the failure to get a precise valuation would not seem to have been particularly relevant to the grounds for rejection. It's not as if they rejected it because, well, the loss amount is so great regardless. It's that, as I understood the rulings, it's that no matter what you can show, we're not going to find that there was any lesser loss amount here. Did I misunderstand? I think you're getting to the heart of the question or at least part of it. If this court intended in its summary ruling in 2013 to say there was absolutely no record that could be created under any circumstance that would call into doubt the district court's loss amount determination, then that may change or affect the validity of our argument or the mandate. Well, even there, the law of the case doctrine has a role to play because this court, when presented with a more expansive record, is permitted to reconsider an issue like that. In fact, this court has much more flexibility than the district court does in that regard. And cases like Brody v. City of Port Chester are good examples. But I don't disagree, Your Honor, that an important part of the question here is what exactly this court was trying to conclude in the original opinion. But here again, I would submit that it's all the more reason why it's important to get to the merits of the case and not allow a procedural bar like the mandate rule to prevent that important determination. And especially in a situation where we're talking about a defendant serving an 85-year sentence, who, with even a small change to the guidelines range, might be serving one less than half of that. So I don't want to – I'm already way over my time, and I don't want to go too far unless there are more questions. I'll just reserve the rest of my time such as it is for rebuttal. All right. Thank you. Ms. Kamau? Ms. Kamau? Can you hear us? I think you're still muted. You're still muted. Can you hear me now? Yes. Excellent. May it please the Court, JoLynn Kamau on behalf of the United States. I represented the United States before the district court with respect to Shapiro's 2255 motion. So I'd like to sort of pick up right where Your Honor's left off, and that is with the loss calculation before the district court and the arguments, both legal and factual, that were made at that time. So as an initial matter, Judge Raggi, you had asked the appellant, whether or not, the cases in other contexts concerning loss calculation, whether they translate into this context. And I would respect this myth that they don't. In this case, Ampley demonstrates why under the guidelines and under this circuit's precedent, loss calculation defendants are entitled to a reasonable estimate of what the loss calculation is. And that's because, I mean, as this case Ampley demonstrates, there is no one-size-fits-all method of loss calculation that is going to do justice, both to defendants and victims, when it comes to crimes such as fraud, which have such an incredible variety of ways in which they can be perpetrated. And in this particular case, unlike in Leonard, and unlike in Wysotzki, the defendants here were, and Mr. Shapiro in particular, they were the founders, CEO, president, who operated the firm, and whose securities were then bought by victims. In Leonard, and in Wysotzki, the defendants there were either the stockbrokers, who engaged in this pricing, or they were other third-party marketers. So when the fraud was discovered in those other cases, there was nevertheless a going concern that company in whose shares they held, that they still were entitled, that they still held an interest in, and that could confer value in that expansive manner in which both the guidelines and this circuit's case law recognize. That was not the case here. In this case, this was more akin to investors, or victims, winding up holding the shares of an ostensibly bankrupt corporation. The company went into receivership upon the indictment of the defendants. And as a result, it is, the defendant cannot meaningfully suggest that the victims were left with anything other than what Judge Bianco referred to as some sort of a paper asset on the day in which the fraud occurred. I just want to clarify that point, because I think that's a very important point. So on the day of the fraud was discovered, you're suggesting, at that point, even if it was worth 15 to 20 million dollars on paper, they had no ability to try to dispose of those units. He suggests that the two-year non-redeemable period may have run for some of the investors. But you're suggesting, even if that two-year period had run, they could not try to dispose of those units and sell them to somebody else. Your Honor, at that point, with the company in the receivership, they are effectively, like the creditors in the bankruptcy, they are the lowest on the totem pole. So you're absolutely correct that at that point, when the company ceases to be a going concern at all, not whether it's on the day of the indictment or at any point thereafter, those shares no longer have any value other than the value that the receiver could realize. And if whatever value they may have had while they were stuck in receivership on the day of the fraud, if they lost that value because of the downturn in the market, then as Judge Radji pointed out, our case law says that goes to the defendants, because these investors, if they had known the background, they wouldn't have invested the money in Cobalt at all. Precisely. And this is why the prior ruling was that there was no realistic possibility that Cobalt shares could have put any value on the victims. That's why that finding at sentencing, that is really the linchpin. That is really the finding that forecloses the arguments that the defendant has now repackaged in effect of the system. I have some issue with the government's trying to invoke the mandate rule generally in these types of cases. I think it's very dangerous to say just because this issue was raised on direct appeal that the mandate rule would preclude it being raised in the 2255 as an effective system of counsel. There are some circumstances, there was a jury instruction, and we concluded on direct review that the jury instruction was proper, and obviously arguing that your lawyer should have objected to it, the mandate rule wouldn't necessarily cause harm there, but I think it could be misinterpreted when there could be additional factual evidence that could be brought to the court's attention, either the trial court or the circuit on direct review, that it could be misused. I don't think any of our cases, they point out that Yikman, Mew, Pitcher, Rocco's, Prado, we have never held, all those cases had some ineffective sentence claim on direct review, and then we applied the mandate rule in some respect to preclude it on 2255, but I think this is a dangerous thing the government is suggesting here, if it's going to be applied generally. So I would say two things there, Your Honor. The first is that there are at least three summary orders following Yikman, in which panels of this court have affirmed its application to ineffective assistance claims that were raised for the first time in 2255. But of course, Your Honor, any time a defendant is seeking to collaterally attack a sentence, a court, district court, appellate court, has to be mindful of what the record was below, both on direct appeal and before the district court. And here, although there may be cases that I understand may activate Your Honor's concern, in this particular case, the defendant was offered ample opportunity, and took advantage of that opportunity to press precisely the legal and factual issues that he has now raised in this 2255. If I may, Director Honors, just very briefly to the record on the direct appeal of the conviction, that is the case number 104426. This is the appellant's reply, it's document 147 on that document, at pages 12, I'm sorry, Your Honor, at page 13 and 14 of the brief. There, Shapiro presses precisely the argument that he has now repackaged as ineffective assistance of counsel. And he says, where the investment yielded security with some value, that value must be deducted from the loss amount, citing Leonard. And then on the next page, at page 14, the appellant pressed again, the unit's value, particularly at the time of detection, was readily accessible via an appraisal of the portfolio of real properties, cobalt found. That value is unknown, as that appraisal was never made due to the district court's refusal to authorize CJA funds precisely for that purpose. This failure must be squarely laid at the district court's feet. Nonetheless, the record is clear that the securities the investors received in exchange for their investments in cobalt held substantial value, and then another citation for Leonard. I understand, Your Honor, there may be cases where the court may have some concern. This is not that case. The district court can reach the same conclusion by just saying there's no prejudice, because for all the same reasons the circuit said on direct appeal, that this wouldn't have made a difference. I've looked at it again. I looked at your expert report, which doesn't say that they could have sold this at the time of the detection of the fraud. There's no prejudice. Isn't that a more careful way to deal with it? You're certainly correct, Your Honor, that the summary orders that have followed Yickman may have typically engaged in that approach, the belt and suspenders. And that's because there is this analytic overlap between the prejudice standard under Strickland that requires that the error alleged or the facts that were omitted have raised to such a level that they could change the outcome. So obviously, if that legal argument or that proposed additional factual finding would not have changed the calculus, that argument is foreclosed. There is that analytic overlap. Notwithstanding, Your Honor, claim preclusion is important. The court in Yickman recognized that it is important for collateral attacks on sentences to be preserved for just that, collateral matters. This was not a collateral attack. These issues, this case law, these proposed facts were clearly before both the district court and this court on direct review of the conviction. And as a result here, both the mandate rule is properly applied. And if the court reaches the merits, the Strickland claim cannot be found to have any merit on this record. But if the court reaches the merits, you're saying that we should do what the district court didn't do and go back and do a Strickland analysis? I do not, Your Honor. I don't think it's necessary here. I'm saying even if the court were to go that direction, the appellant's petition would fail. I say I'm over time, but I'm happy to take other questions if the court would like to ask. No, I don't think so. That's fine. Thank you. We'll now hear from Mr. Loker for two more minutes of rebuttal. Thank you, Your Honor. May it please the court. I disagree that we're pressing the same factual information here. It's true that on appeal, Leonard was cited. But that was, again, on the basis of the record as it existed at that time, which is very different from the record we have now, which consists of literally thousands of pages of expert analysis. As to the issue of liquidity, I want to make clear that although I used market forces as one example of the reason why the value of the securities in early 2006 ended up being much lower by the time they were actually liquidated in 2010 or around that time, that's not the only reason. There certainly could have been and may very well have been negligence on the part of the receiver or other issues that helped contribute to that loss. But ultimately, that, to me, illustrates the wisdom of this court's approach in Leonard in recognizing, and in Borkoski, in recognizing even with respect to illiquid assets that you have to look at the value as of the time of discovery of the fraud because that's the moment when the defendant's loss is truly crystallized. And that's the moment that we're focusing on with our 2255 evidence for the first time. If the assets were already in receivership at the time of the detection of the fraud, they had no ability to realize it's zero. And then if negligence or market forces or whatever subsequent to that time reduced it on paper to zero, your client doesn't get a benefit from that. If they wouldn't have invested the money in the first place in Cobalt, if they had known his background, then he doesn't get any benefit from the fact that market forces reduced it on paper to zero after that point. The key thing is that at the time of the detection of the fraud, they couldn't get to these units to try to have them have any value. But, Your Honor, the fact that assets are in receivership or a company is in receivership doesn't mean that the company doesn't have any value. And, in fact, that's the point of the evidence that we've submitted in connection with this 2255 case. We believe, and we've got experts to support this, that there was $15 to $20 million in net equity value. So the fact that it couldn't be liquidated immediately in 2006 doesn't mean the value wasn't there at all. And that's the point of our 2255. It has to be able to generate value to the investors at the time of the detection of the fraud. It has to be able to generate value to the investors there. Or, if it's somehow retained, then I guess you can continue to look at it if it's illiquid. But my point is that it had no ability to generate value to them at the detection of the fraud. And then whatever value it had was dissipated through other forces that the victims don't bear the responsibility for, based upon what Judge Raggi was citing. I respectfully submit that there's a difference between value and liquidity. And that's the issue that Leonard got to. I certainly understand your point, Your Honor. But in our view, under Leonard, had Mr. Shapiro's trial counsel created a sufficient record, we would have ended up in a situation where, rather than facing an 85-year sentence, which is effectively a sentence of life imprisonment, he would have had something considerably, considerably less than that. So for those reasons and the reasons in our brief, we ask that, to the extent there aren't further questions, which there may be, the court reversed. May I ask, I mean, your argument seems to me to be more probative at a decision on restitution for loss, where the court is obliged to identify actual loss to the investors. And to that extent, to the extent there are assets that could mitigate that loss, they don't get to recover more. But I don't understand how your argument is sound with respect to identifying the scope of the fraud and, therefore, its seriousness. Well, the issue, again, I think, Your Honor, is that the goal in determining loss amount, particularly in these high-level white-collar cases where the guidelines can lead to some awfully long sentences, the goal is to figure out and isolate the losses that were caused, directly caused, approximately caused by the defendant's conduct as opposed to subsequent events. And it's true that the defendant may have set those events in motion in some way, but ultimately, as I read Leonard and as I read Rutkoski, the determination still has to be made at the moment of the discovery of the fraud. Thank you. Thank you, Your Honor. Thank you. We will reserve decision, well argued.